UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRUCE BIERMAN,

    Plaintiff,

    v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

    Defendant.

_____/

No. C 10-4199 PJH

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant's motion for summary judgment came on for hearing before this court on December 15, 2011. Plaintiff Bruce Bierman appeared by his counsel Alfredo Torrijos, Thomas Stolpman, and J. Paul Gignac, and defendant International Business Machines Corporation ("IBM") appeared by its counsel Peter Stone. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motion.

**BACKGROUND**

This is a case alleging misappropriation of trade secrets, breach of contract, and fraud. Plaintiff Bruce Bierman invented and developed a product and technology called "Bookmark," which he asserts was later stolen by defendant IBM. Bierman describes "Bookmark" as "data protection software" that "takes a picture" of a computer system's state, suspending all open programs and unsaved work, and storing that "image" to the system's storage medium for later resumption, either automatically or manually. Bierman claims that this technology allows users to auto-resume work in the event of power failure,

hardware breakdowns, or system shutdown, and also allows users to pick up where they left off by pressing the "resume" key.

Bierman, who is not a programmer himself, hired a programmer, Dirk Wesseling ("Wesseling"), to help turn his concept into functioning software. According to Bierman, by the early part of 1985, Wesseling had provided a working prototype of the Bookmark software, and by the latter part of 1985, the software was developed sufficiently that Bierman felt able to proceed with selling/licensing the technology. He claims that the first company he approached was IBM, with which he already had a business relationship.

In June 1986, Bierman formed Intellisoft International, Inc., for the purpose of selling Bookmark. He then entered into a publishing and marketing agreement with Intellisoft International, Inc., pursuant to which he licensed the "technology, trade names, trade secrets, patents, copyright and intellectual property in the Bookmark Software."

On December 12, 1986, with the assistance of counsel, Bierman and Wesseling filed an application with the U.S. Patent and Trademark Office for a patent for Bookmark. On January 7, 1987, Bierman, at the direction of counsel, executed a document assigning to Intellisoft International his rights, title, and interest in the "invention" described in the patent application.

On April 7, 1987, Intellisoft International (also acting through counsel) submitted a copyright application to the U.S. Copyright Office, for the Bookmark source code. The application shows Wesseling as the author, and shows Intellisoft International as the copyright claimant. It does not mention Bierman.

The application is dated April 6, 1987, and the accompanying cover letter from counsel is dated April 7, 1987. The receipt for certified mail shows the date of mailing as April 7, 1987, and a return receipt from the Registrar of Copyrights shows receipt on April 9, 1987.

As issued, the copyright registration bears a stamp stating that the effective date of the registration was April 9, 1987. IBM has submitted a declaration from its expert Ralph Oman, who was the Registrar of Copyrights from 1985 to 1993, stating that at the time the

Bookmark copyright application was submitted, it would have taken four to six months for typical processing of an application to generate a copyright registration certificate. Thus, according to Mr. Oman, Bierman could not have received the copyright registration until July 1987 at the earliest.

Nevertheless, Bierman asserts that on April 9, 1987, the same date that the Copyright Office received the copyright application, he executed an assignment of the trade secrets in this case, including the Bookmark copyright and patent application, from Intellisoft International (he signed as President) to himself (he signed for himself). He denies that the assignment was signed at some late date and backdated.

According to Bierman, he executed the assignment at the direction of counsel, because he was "understandably unhappy" with the January 7, 1987 document that assigned all his rights and interests in Bookmark to Intellisoft International. He was also concerned because the application for copyright registration listed Intellisoft International as the claimant, but failed to list him as a co-author. Bierman testified that it was his understanding that by executing the assignment, he was "getting back what was already mine."

Although Bierman insists that the April 9, 1987 assignment was not backdated, it is Mr. Oman's opinion that the assignment was fraudulent, based on the fact that Bierman could not have received the registration from the Copyright Office until July 1987 at the earliest – or at any rate, could not possibly have received it on April 9, 1987 (the same day that his application was received by the Copyright Office).

Bierman testified in his deposition that throughout the period between 1986 and 1996, when he was selling Bookmark and obtaining licensing and original equipment manufacturer agreements for the Bookmark product, he considered himself to have a specialized knowledge of the computer industry, compared with a lay person. He also claims to have actively advertised the Bookmark product in numerous computer industry publications.

Bierman asserts that between 1985 and 1995 he engaged in discussions with IBM

3

regarding the licensing of the Bookmark technology and products, and provided IBM with confidential information regarding Bookmark. He also alleges that in 1986, based on IBM's representations that it intended to license Bookmark, he provided IBM (at its request) with a "confidential 'evaluation version'" of the Bookmark software for evaluation. As a condition of providing IBM with the software, Bierman allegedly demanded that IBM enter into a confidentiality and non-disclosure agreement ("NDA").

However, Bierman provides no evidence of the discussions between himself and IBM, or of the NDA, other than statements in his own declaration. IBM notes that Bierman later attempted to change this testimony about the date of the purported NDA, and that his testimony is also contradicted by his responses to interrogatories.

Bierman allegedly continued to pursue a licensing agreement with IBM for the Bookmark product from June 1986 through the fall of 1995. In his supplemental responses to interrogatories, Bierman claims to have had more than 65 separate conversations with IBM during that period. Bierman alleges that IBM never intended to pay for the license, and instead misappropriated his confidential trade secrets.

Bierman states in his responses to interrogatories that IBM's "Rapid Resume" and any software system employing "Rapid Resume" or related technology "misappropriated some of all of [his] trade secrets" from the Bookmark product, and that IBM published the trade secrets in 12 patents issued by the U.S. Patent and Trademark Office.[1]

On September 26, 1988, Bierman filed for bankruptcy on behalf of Intellisoft International, Inc., in the Northern District of California. He testified in his deposition that he had been marketing the Bookmark product through Intellisoft International, and was filing for bankruptcy protection because of advertisement debt and a trademark dispute. Bierman claims that an additional NDA was signed between IBM and Intellisoft Ltd in 1988,

---

[1] However, IBM provides evidence showing that it began publicizing its "Rapid Resume" feature – which allowed Windows users to turn their systems off without closing any files, and which would cause the PC to store everything to the hard drive – in October 1993, and that it made numerous public announcements of its products using "Rapid Resume" and sold thousands of computers with that feature from 1993 to 1997.

4

after he informed IBM that Intellisoft International Inc. was filing for bankruptcy. Again, however, Bierman provides no copies of any NDA signed by IBM. He testified in his deposition that by the summer of 1999, he had thrown away all agreements and documents relating to IBM.

In the bankruptcy filing, which was signed by Bierman, Intellisoft International Inc. estimated its number of creditors as between 50 and 99, and its liabilities as from $500,000 to $999,000. In its list of scheduled assets, Intellisoft International Inc, did not disclose the agreements it had allegedly entered into with Bierman to sell the Bookmark products and Bookmark technology, or any executory contracts such as trade secret licenses, or distribution or marketing agreements.

Intellisoft International Inc. also stated that it owned no licenses or "other general intangibles," and listed no interest in trade secrets, no NDA, and no agreement related to IBM. In addition, while Bierman owned 100% of the stock of Intellisoft International, Inc., he was not listed as a "person who directly or indirectly owns, controls, or holds with power to vote, 20% or more of the voting shares."

On October 3, 1988, one week after Intellisoft International Inc. filed for bankruptcy, Bierman formed a new company in Delaware – Intellisoft Ltd. – and granted this company the same licensing, marketing, and distribution agreement to use the Bookmark products and technology as he had previously granted to Intellisoft International Inc. Bierman was both the President and the Secretary of this new entity, and he immediately issued the same software publishing and marketing agreement to Intellisoft Ltd that he had previously issued to Intellisoft International Inc. to market and sell the same product.[2]

On March 22, 1991, Bierman sold and transferred all rights to Bookmark to his mother, Sonia Bierman, for $80,000. This sale and transfer included all "intellectual property," "trade secrets," "agreements," and "NDAs." It also included 100% ownership of

---

[2] On November 3, 1989, Intellisoft Ltd. changed its name to Silverware, Inc. That name was changed to Solidsoft, Inc. on October 15, 1990. Solidsoft became inoperative on March 1, 1994. Then, on September 1, 2010, Bierman (acting as President of the corporation) renewed the corporate charter and again changed the name, back to Intellisoft Ltd.

5

Solidsoft, formerly Silverware, Inc., and Intellisoft Ltd., Intellisoft GmbH (an Austrian subsidiary), and Intellisoft International Inc.

On January 10, 1992, the Intellisoft International Inc. bankruptcy was closed with no assets distributed.

On September 24, 1993, Bierman filed for personal Chapter 7 bankruptcy in the Central District of California. In his list of scheduled assets, Bierman did not disclose the Bookmark technology or product, and also stated that he owned no intellectual property, and no "licences, franchises, or other intangibles;" and owned no stock or interest in any incorporated or unincorporated businesses or any contingent or unliquidated claims. On March 23, 1994, Bierman's personal bankruptcy closed with his debt being discharged with no assets distributed to his creditors.

On November 5, 1994, Bierman bought back all the assets he had previously sold to Sonia Bierman, for $1 (one dollar). Sonia Bierman died in January 1998.

Bierman testified that by late 1996 or very early 1997, Bookmark was – to his understanding – no longer in commercial use, and by 1997, Intellisoft Ltd. and Intellisoft GmbH had ceased doing business. He asserts that by about 1997, he had "completely exited the computer industry." He claims that he considered Bookmark to be obsolete at that point, primarily based on his understanding that Microsoft had developed a "new solution" to the problem that Bookmark was supposed to have solved.

Nevertheless, notwithstanding his belief that the technology was obsolete, on February 6, 2002, Bierman sold and transferred all rights to the Bookmark product and all ownership of related companies (i.e., all assets he previously sold to his mother) to a friend, Angelo DiLeva, for $21,000. Mr. DiLeva testified in his deposition that he did nothing to protect the alleged trade secrets.

On October 11, 2005, Bierman again filed for personal Chapter 7 bankruptcy in the Central District of California. He stated that he owned no "licenses, franchises, or general intangibles," and that he held no stock or interest in any incorporated or unincorporated businesses or any contingent or unliquidated claims. He listed no claims as a third-party

beneficiary to an alleged NDA or contracts with IBM or any other company. On April 10, 2006, Bierman's chapter 7 bankruptcy closed with his debt discharged and no assets distributed to his creditors.

On July 14, 2006, Mr. DiLeva sold and transferred the assets he had previously purchased from Bierman, back to Bierman. In his deposition, Bierman acknowledged that the material he purchased from DiLeva was the same material he had sold him in February 2002.

Bierman asserts that in March 2010, he was contacted by attorneys representing Wistron Corporation ("Wistron"), who told him that Toshiba Corporation had filed a complaint with the U.S. International Trade Commission asserting that Wistron was infringing on its patents. Bierman claims that the Wistron attorneys told him that they had learned that one or more of the patents that Toshiba sought to enforce involved technology that might have been developed by Bierman.

Bierman investigated the matter, and asserts that by June 2010 he had discovered that IBM had also applied for and obtained one or more patents based on the Bookmark technology. He contends that the inventor listed on IBM's patent applications was the same individual who had been his contact at IBM during the time IBM was evaluating the Bookmark technology. Thus, he asserts, it was not until June 2010 that he first discovered that IBM had stolen his Bookmark technology, and had used it for financial gain.

Bierman filed the complaint in the present action on September 17, 2010, and filed a first amended complaint ("FAC") on October 15, 2010. IBM moved to dismiss all claims asserted in the FAC, arguing in part that the claims were barred by its affirmative defenses of judicial estoppel, lack of prudential standing, and running of the statute of limitations. The court denied the motion as to the affirmative defenses, on the ground that the existence of factual disputes made those issues inappropriate for resolution in a Rule 12(b)(6) motion.

On January 7, 2011, Bierman filed the second amended complaint ("SAC"), asserting eight causes of action. IBM filed an answer to the SAC on January 24, 2011.

**DISCUSSION**

A. Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 994 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson, 477 U.S. at 250; see also Fed. R. Civ. P. 56(c), (e).

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

B. IBM's Motion

IBM seeks summary judgment, as to three of its affirmative defenses. IBM asserts that the complaint in this case is time-barred, because Bierman had actual and constructive

knowledge of the alleged misappropriation more than four years before filing suit, and also because he cannot satisfy his burden of proof on the discovery rule as to all owners. IBM also argues that Bierman lacks standing, and that his complaint is barred by the doctrine of judicial estoppel.

        1.      Whether the complaint is time-barred

IBM argues that the claims alleged against it are time-barred, because Bierman had actual and constructive knowledge of the alleged misappropriation more than four years before filing suit. In a federal diversity action based on alleged violations of state law, the state statutes of limitations control. See, e.g., Yumul v. Smart Balance, Inc., 733 F.Supp. 2d 1134, (C.D. Cal. 2010). None of the applicable statutes of limitations provides for a limitations period of more than four years.[3]

A cause of action accrues and the statute of limitations begins to run when the cause of action is complete with all of its elements. Norgart v. Upjohn Co., 21 Cal. 4th 383, 397 (1999). IBM contends that this would have occurred between 1986 and 1995, when the alleged misappropriation occurred.

Bierman asserts that the "discovery rule" applies to toll the running of the limitations period(s). Because Bierman alleges claims based on state law, the California "delayed discovery rule" applies. See, e.g., Yumul v. Smart Balance, Inc., 733 F.Supp. 2d 1134, 1141 (C.D. Cal. 2010). Under the California discovery rule, the accrual date of a cause of

---

[3] The applicable statutes of limitations are as follows: (1) for trade secret misappropriation, three years, Cal. Civ. Code § 3426.6; Glue-Fold, Inc. v. Slautterback Corp., 82 Cal. App. 4th 1018, 1024 (2000); (2) for breach of confidence, two years, Cal. Civ. Proc. Code § 339(1); Davies v. Krasna, 14 Cal. 3d 502, 510-11 & n.6 (1975); (3) for implied-in-fact contract, two years, Cal. Civ. Proc. Code § 339(1); Benay v. Warner Bros. Entm't, Inc., 607 F.3d 620, 632-33 (9th Cir. 2010) (applying California law); (4) for intentional misrepresentation and fraudulent concealment, three years, Cal. Civ. Proc. Code § 338(d); West Shield Investigations & Sec. Consultants v. Super. Ct., 82 Cal. App. 4th 935, 955 (2000); (5) for breach of written contract, four years, Cal. Civ. Proc. Code § 337; Amen v. Merced Cnty. Title Co., 58 Cal. 2d 528, 532-34 (1962); (6) for breach of oral contract, two years, Cal. Civ. Proc. Code § 339; Amen, 58 Cal. 2d at 532-34); (7) for unjust enrichment, three years, Cal. Civ. Proc. Code § 338 (d); Fed. Deposit Ins. Corp. v. Dintino, 167 Cal. App. 4th 333, 347-48 (2008); and (8) for an accounting, three years, Jefferson v. J.E. French Co., 54 Cal. 2d 717, 719 (1960) (limitations period in action for accounting is determined by the underlying right/obligation at issue).

9

1  action is delayed until the plaintiff discovers, or should discover, his cause of action.
2  Norgart, 21 Cal. 4th at 397-98; Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1109 (1988); see
3  also Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807-08 (2005).

4  Thus, a plaintiff is held to his actual knowledge as well as knowledge that could
5  reasonably be discovered through investigation of sources open to him. Jolly, 44 Cal. 3d at
6  1109. This includes information published in literature, and public disclosure of the trade
7  secret, in the plaintiff's field. See In re Burbank Envtl. Litig., 42 F.Supp. 2d 976, 981-82
8  (C.D. Cal. 1998); Stutz Motor Car of Am., Inc. v. Reebok, Int'l Ltd., 909 F.Supp. 1353, 1362
9  (C.D. Cal. 1995).

10  Here, because Bierman will have the burden of proof at trial to establish that he is
11  entitled to the benefit of the discovery rule, he can defeat summary judgment only by
12  coming forward with evidence establishing a triable issue of fact with regard to whether the
13  discovery rule applies. See O'Connor v. Boeing N. American, Inc., 311 F.3d 1139, 1150
14  (9th Cir. 2002).

15  IBM contends that the evidence shows that Bierman had actual knowledge of the
16  facts that would give rise to a reasonable suspicion of wrongdoing. IBM also contends
17  Bierman had constructive knowledge, because a person in Bierman's position – claiming to
18  be an actively involved businessman and an expert in the computer industry – would have
19  investigated to see if IBM were using a technology similar to Bookmark. IBM asserts that a
20  quick search would have revealed the existence of its "Rapid Resume" product.

21  In a second argument, IBM contends that the action is also time-barred because
22  Bierman cannot satisfy his burden of proof under the discovery rule as to all
23  owners/assignors of the intellectual property. An assignee's rights are derivative of
24  whatever rights the assignor may have. That is, an assignee stands in the shoes of its
25  assignor, taking its rights and remedies, subject to any defenses that the obligor has
26  against the assignor. See Royal Bank Exp. Fin. Co. v. Bestways Distrib. Co., 229 Cal. App.
27  3d 764, 768 (1991).

28  Here, Bierman did not own the intellectual property for the entire time since its

development in 1985. He assigned it to Intellisoft International, Inc., in January 1987, and Intellisoft International allegedly assigned it back to him in April 1987. He then assigned all rights and ownership to Sonia Bierman in March 1991, and she assigned it back to him in November 1994. Finally, in February 2002, he again sold and transferred all rights to the Bookmark technology and product, this time to Angelo DiLeva, who reassigned the assets to Bierman in July 2006.

Because Bierman, as plaintiff-assignee, invokes the discovery rule as an exception to the statute of limitations defense, he bears the burden of proving that the discovery rule could also be invoked by his assignor. Thus, he must show that both he and his assignor lacked the requisite knowledge of their alleged injury, and that they diligently pursued their claims when they were put on notice of their injury.

Here, Bierman's alleged misappropriation injury stems from IBM's use of "Rapid Resume" technology in IBM PCs that were released starting in 1993. This occurred during Sonia Bierman's ownership of the Bookmark product and related companies and agreements – all of which she owned from March 22, 1991 until November 5, 1994. IBM asserts that Bierman cannot carry his burden of showing that the discovery rule applies, because, as noted above, Mrs. Bierman died in January 1998.

In opposition, Bierman argues that the discovery rule does not require that he demonstrate the knowledge of his deceased mother, whom he claims was a "shareholder" of the Intellisoft entities (Intellisoft Ltd. and Intellisoft GmbH).[4] He notes that pursuant to the purchase and sales agreement, he was to remain as the President of the corporations (which were fully owned by his mother), and he would assist in directing development and marketing in order to obtain a reasonable return of investment to his mother.

For this reason, Bierman asserts, Sonia Bierman had the right to rely on him regarding all aspects of the Intellisoft companies in which she was a shareholder (the sole

---

[4] In the March 22, 1991, Asset and Sales Agreement, Bierman sold his mother 100% of the shares of Silverware, Inc. (formerly known as Intellisoft Ltd), 100% of the shares in Intellisoft GmbH, and 100% of the shares in Intellisoft International, in addition to assigning her all rights and interest in the intellectual property.

11

shareholder), as well as with regard to the Bookmark technology. He claims that since he was the agent entrusted with Sonia Bierman's property, his testimony is wholly sufficient to establish that his mother had no knowledge of the alleged misappropriation by IBM.

While the existence of triable issues of fact preclude summary judgment as to whether Bierman had actual or constructive knowledge of the alleged misappropriation; whether and when Bierman had a duty to investigate; whether the publicity surrounding IBM's "Rapid Resume" was sufficient to put Bierman on constructive notice of his claims against IBM; and whether Bierman exercised reasonable diligence, the court finds that the motion must nonetheless be GRANTED, because Bierman has failed to provide any evidence showing that Sonia Bierman, a prior owner/assignor of the trade secrets, can invoke the discovery rule.

In order to invoke the discovery rule, Bierman is required to prove a lack of knowledge of all assignors, including Sonia Bierman, since Bierman, as an assignee, stands in the shoes of his assignor, taking her rights and remedies subject to any defense which the obligor might have against the assignor (such as a statute of limitations defense).

Because Mrs. Bierman directly purchased the trade secrets from Bierman, Bierman is required to provide proof of her lack of knowledge – not the corporation's lack of knowledge. Sonia Bierman was not just a shareholder, as Bierman attempts to argue – rather, she directly owned the trade secrets at issue. Thus, it is Mrs. Bierman's knowledge, not the knowledge of the Intellisoft entities, that is at issue.

Bierman claims that his mother relied on him, and that because he was her "agent," his testimony should be sufficient to show the state of her knowledge. However, Bierman's statements about his mother's interest or lack of interest in aspects of the computer world say nothing about what she actually knew about any accrued claims, or whether she did or did not act diligently during the time she owned the intellectual property.

It is Bierman's burden to prove lack of knowledge throughout the entire history of the existence of his trade secrets, from the time he first allegedly talked to IBM in 1985, until 2010 when he allegedly discovered for the first time that IBM had misappropriated the trade

12

secrets. However, he has provided no evidence showing that he can do so for the period of time that the intellectual property was owned by his mother.

### 2. Whether the complaint is barred by the doctrine of judicial estoppel, and whether Bierman lacks standing

IBM argues that Bierman should be judicially estopped from bringing all claims alleged in this lawsuit because he is seeking to enforce unscheduled claims based on intellectual property assets he concealed from the bankruptcy courts. IBM also asserts that because the assets belong to the bankruptcy estate, Bierman lacks standing to assert these claims.

A Chapter 7 bankruptcy creates a bankruptcy estate holding all legal and equitable interests in a corporation's assets. See 11 U.S.C. § 541(a). The estate consists of all tangible, as well as its intangible, assets, including contract rights, intellectual property, and causes of action owned at the time of the bankruptcy petition. 11 U.S.C. § 541(a)(1)-(7); see also Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008); United States v. Inslaw, Inc., 932 F.2d 1467, 1471 (D.C. Cir. 1991). Contract rights also become the property of the bankruptcy estate whether or not a breach of contract had occurred at the time of filing. In re Yonikus, 996 F.2d 866, 869 (7th Cir. 1993); In re Ryerson, 739 F.2d 1423, 1425 (9th Cir. 1984).

Bankruptcy petitioners have an affirmative duty to "schedule" all their assets and liabilities, i.e., disclose and list them for the court. 11 U.S.C. § 521(c); Cusano v. Klein, 264 F.3d 936, 945-46 (9th Cir. 2001). Any unscheduled assets – assets the claimant fails to list during the bankruptcy proceedings – revert permanently to the bankruptcy estate at the close of the proceedings. Id. at 946. A debtor lacks standing to later assert any rights based on unscheduled assets. In re JZ, 371 B.R. 412, 418 (B.A.P. 9th Cir. 2007).

"Judicial estoppel" is "an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001). In determining whether to apply the doctrine of judicial estoppel, the district

court may consider whether a party's later position is clearly inconsistent with its earlier position; whether the court in the earlier lawsuit accepted the party's initial position; and whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Id. at 782–83; see also In re JZ, 371 BR at 418.

Judicial estoppel has been imposed in connection with bankruptcy cases where "the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy, but fails to amend his schedules or disclosure statement to identify the cause of action as a contingent asset." Hamilton, 270 F.3d at 784. In the bankruptcy context, judicial estoppel prevents a party from asserting an unscheduled claim after his bankruptcy case closes – the rationale being that the bankruptcy system's integrity depends on debtors fully and honestly disclosing all of their assets. Id. at 785.

Bierman alleges that IBM entered into an NDA with Intellisoft International Inc. in June or July 1986, under which trade secrets and confidential information were disclosed; that Bierman and Wesseling assigned all rights in the Bookmark "invention" to Intellisoft International in January 1987; and that Intellisoft International assigned the trade secrets back to Bierman on April 9, 1987. However, IBM contends that the purported assignment from Intellisoft International to Bierman was backdated and therefore fraudulent and invalid.

IBM asserts that Intellisoft International had a duty to schedule, and amend the schedules, to list any assets, tangible or intangible, including the trade secrets and any alleged NDAs with IBM. Cusano, 264 F.3d at 947. IBM contends that pursuant to 11 U.S.C. § 541(a)(1)-(7), Intellisoft International's Chapter 7 bankruptcy in 1988 created a bankruptcy estate holding all of the then-existing assets, tangible and intangible. See Chartschlaa, 538 F.3d at 122. For this reason, IBM argues, Intellisoft International, and any successor such as Bierman, is now estopped from asserting such causes of action based on these assets. Id. at 946. Instead, any such assets and causes of action belong to the bankruptcy estate, and Intellisoft International and Bierman lack standing to assert them. In re JZ, 371 B.R. at 418.

14

The court finds that the existence of triable issues precludes the granting of summary judgment as to the affirmative defenses of judicial estoppel and standing. In particular, the question of the timing of the purported assignment of the Bookmark trade secrets and other intellectual property rights in 1997 and the question whether that assignment was fraudulent cannot be resolved on a motion for summary judgment. Nevertheless, as discussed above, summary judgment is appropriate because Bierman has not shown that the statute of limitations was tolled during the time that Mrs. Bierman owned the Bookmark trade secrets and intellectual property.

## CONCLUSION

In accordance with the foregoing, the court finds that summary judgment must be GRANTED. The claims accrued more than four years before the complaint was filed, and Bierman cannot meet his burden of showing that the limitation period should be tolled.

**IT IS SO ORDERED.**

Dated: February 15, 2012

PHYLLIS J. HAMILTON
United States District Judge